CLARENCE B. MAY v. EDSON C. CUMMINGS, E. A. Perry, Thomas Baker, Jr., Will Freeman, and the William H. White Lumber Company.

(130 N. W. 826.)

**Mortgages — Merger.**

    1. Whether or not a mortgage upon real estate is merged in a deed given by the mortgagor to the mortgagee depends upon the intent and interests of the mortgagee.

**Mortgages — Merger — Evidence.**

    2. In this case the evidence shows no agreement to merge titles, and they will be kept separate.

**Mortgages — Possession by Mortgagee — Credit on Mortgage Notes — Evidence.**

    3. In the absence of evidence of the value of the occupation of lands, the mortgagor is not entitled to any credit upon his notes. He has the burden of showing such value.

Opinion filed March 10, 1911.

Appeal from District Court, Cass county; *Pollock,* J.

Action by Clarence B. May against Edson C. Cummings and others. Judgment for plaintiff, and defendants appeal.

Affirmed.

*Turner & Murphy* and *E. H. Wright,* for appellants.

*M. A. Hildreth,* for respondent.

Burke, J.   In the year 1888, Edson C. Cummings, one of the defendants herein, bought of the plaintiff a farm in Cass county, North Dakota, for the agreed price of $5,040.   He paid no money down, but gave his notes due in instalments of $500, one each year for ten years, and to secure the same gave a mortgage to May upon the land.

Cummings went upon the land and farmed the same until 1905. Owing to his crops being drowned out, he was unable to reduce his indebtedness upon the land, and by the end of the year 1905 owed May considerable more than the original purchase price.   In addition to his indebtedness to May, Cummings owed various other persons and firms, and some of those creditors had reduced their claims to judgments, and the defendant William H. White Lumber Company had filed a mechanics' lien against the land.   This lien and the judgments of the other creditors were a lien upon Cummings's equity in the land, but inferior to the mortgage debt owned by May.

Late in the year 1905 Cummings left the place and removed to another part of the state.   He says that he did not intend to return. That the seasons had been too wet and the farm had not paid expenses. The last payment he had made upon May's mortgage was in 1903. That he had made no payment in 1902; that he had not paid the taxes.   Before leaving the farm he had a talk with May regarding his affairs, and told May that he could not keep the place.   To use his own language: "I told him that I couldn't keep the place any longer, and that I would give him a quitclaim deed, or he might foreclose, and I would waive my right of redemption; he could do either, that is, he said that he thought he could foreclose for less than the judgments that were against the land.   He was to take his choice, either to take the land with the judgments against it, or to foreclose it; whichever, on investigation, he should decide was the cheapest for him; that was my understanding of it."

Q. Did he say anything about giving up the notes or anything of that kind?

Ans. I don't remember whether there was anything said about giving up the notes; I understood.   .  .  .

Q. He didn't say anything about them?

Ans. Not that I remember of.

Q. Now, let me see if the judge and I understand you right; you

told him that he could take his choice, take a deed or foreclose, did you?

Ans. Yes.

Q. You did not at that time demand the notes back?

Ans. No.

Q. You have never demanded the notes back, have you?

Ans. I never have. There was something said about the judgments, but, as near as I can recollect, Mr. May said he thought he could foreclose for less than he could buy the judgments.

Q. I want to get at what you said to him, what was your proposition to him, what were you going to give him this deed for, if anything?

Ans. I was going to give him the deed if he took the deed to clear me from the place. My proposition was that he should pay those judgments and I give him a deed.

Q. Mr. May asked you for a warranty deed, didn't he?

Ans. He asked for a quitclaim deed.

Q. Didn't he ask you at one time for a warranty deed?

Ans. Not that I remember of. I don't remember any such talk. I offered to give him a quitclaim deed.

Q. You wouldn't say that he didn't ask you for a warranty deed, would you?

Ans. I wouldn't say, but I do not recollect it.

Q. You heard Mr. May's testimony about this conversation?

Ans. Yes.

Q. Is that substantially correct?

Ans. It is.

Mr. May, also, was a witness, and gave his recollection of this conversation. He says: "He (Cummings) came down and told me that he couldn't farm it any more; that he was going to leave the farm, he was going up where his son-in-law was; I asked him for a warranty deed, and he told me that he couldn't give me a warranty deed on account of the judgments that were against him, and he told me about the judgments at that time; but he did offer to give me a quitclaim deed. That was about all there was to it, and I did not decide what I would do for certain." "He wanted me to pay the liens."

Q. (On cross-examination) As I understand you, his proposition,

in effect, was that you release his debt, that is the debt secured by this mortgage, and that you take care of this judgment and liens, etc., against the lands.

Ans. Yes, that is what he wanted. We did not come to any definite agreement.

Q. There were a number of those liens and judgments?

Ans. Yes, there were some that I never heard of before now. I knew of the Freeman and Perry judgments. The Baker judgment I never knew of until this fall. Then Cummings moved off from the farm. I wrote him saying I declined his offer.

Q. When did you make up your mind that you wanted this deed, and how did you communicate your conclusion to Mr. Cummings?

Ans. Well, along in the summer there was a pretty fair looking crop there, and I got to thinking about who I was raising the crop for, whether for myself or somebody else, and I thought I would write to him and get a quitclaim deed to protect myself in the crop; fearing that creditors might step in and claim the crop; I was not afraid that Cummings would, but was afraid that his creditors might, and when I wrote him for the deed I did not think at all about or take into consideration the conversation we had had the fall before.

The letter written by May to Cummings reads as follows:

Aug. 6, 1906.

Mr. E. C. Cummings,

Dear Sir:—Will you please send me a quitclaim deed made to Emily E. Ray, as you offered last fall. I find it very expensive to foreclose, and believe I can settle that claim against you if I have a deed for less.

Yours truly,

C. B. May.

On the trial Mr. May further testified:

Q. Mr. May, what did you mean by that expression in your letter then?

Ans. Well, I don't hardly know what I did mean by it, but I must have meant that I thought I could settle them.

Q. Did you know what they were at that time?

Ans. No, I never knew anything about only the two. That letter had slipped my mind, I thought when I wrote to him and asked him for a deed that I did not mention anything, only asked for a deed.

Q. Do you mean to say, in that letter, you promised to pay those judgments?

Ans. No, the letter does not so state.

Q. Did you mean to take care of those judgments in that letter?

Ans. No.

Q. What did you mean, then, when you say what you did?

Ans. I didn't know but I could settle with the creditors, instead of foreclosing.

Q. Did you ever consider that you had discharged this morgtage and that it had been merged into this deed, or anything of that kind?

Ans. Why, I didn't think enough of the quitclaim deed that I wanted to record it.

Q. You thought that in spite of the deed you would have to foreclose your mortgage?

Ans. I thought I would to get title to the land, yes.

Q. What did you take the deed for, then?

Ans. To shut out the creditors on the crop I was raising.

Q. Why did you take the deed in the name of your daughter?

Ans. You have asked me something I cannot answer, for I don't know myself why I did it.

Q. You claim to own this land, do you not?

Ans. No, I can't say that I claim it. I have had possession of it.

Q. You say to this court that you do not claim to own this land?

Ans. Yes.

Q. You have authorized Mr. Hildreth, your attorney, to bring an action here in which he asserts a title in your daughter for your sole use and benefit?

Ans. I employed Mr. Hildreth to take care of this affair for me, and I turned it over to him and he has taken care of it.

Q. Do you claim that your daughter owns the farm?

Ans. Well, it is a piece of land without any ownership nearly.

Q. Do you think Mr. Cummings owns it?

Ans. He says that he doesn't, and I hardly think he does. It is a piece of land that there is a big question on about who does own it.

As will be seen from the foregoing testimony Mr. Cummings, after he had abandoned the land, gave a quitclaim deed of the same to the daughter of Mr. May, and this daughter was made plaintiff in a suit to quiet title to the land for the use and benefit of Mr. May.

At the same time Mr. May started an action to foreclose his mortgage, and made the owners of the judgments and liens parties thereto, and the two actions were tried together upon stipulation of counsel. At the close of the trial, the trial court ordered judgment that the mortgage be foreclosed, and that the action started by Emily E. May be dismissed without prejudice. The defendants have appealed from both cases. The opinion in the case of Emily E. May against the same defendants will be found in post, 286, 130 N. W. 828.

The defendants in this action desire a review of the entire case in this court. They contend, first, that the quitclaim deed to Emily E. May is in effect a deed to Clarence B. May, and was given and accepted in satisfaction of the Cummings' mortgage, and that the said mortgage became merged in Clarence B. May's title so derived, and that the judgments and liens of the defendants are the first and only encumbrances upon the land. Secondly, they claim that even if defeated in their first contention, that May is bound to credit upon the Cummings notes the reasonable value of the use of the land for the years subsequent to 1905.

Taking up the questions raised in the order named, we find it practically admitted that the question whether or not a mortgage becomes merged when the mortgagee buys the fee title depends upon the intent and interest of the mortgagee. The appellants insist, however, that this rule can be changed by contract of the parties interested, and that such a contract has been proven in the present case. We are unable to find any evidence to sustain their contention. In the first place the defendants, other than Cummings, were not parties to any contract, nor did they know of any negotiations between May and Cummings. May was laboring under the mistaken belief that his mortgage would merge, as a matter of law, as soon as he took a deed from Cummings, but there is no evidence that he desired such a result and agreed with Cummings to bring it about. During all of the time, he was hostile to the judgment creditors, and seeking a way to defeat their claims against the land. In his letter to Cummings he intimates that

he might settle with those creditors, if they accepted less than the costs of foreclosure. That he deliberately made a contract to place those hostile judgment creditors in a position where their judgments were superior to his own mortgage taken for the purchase price of the land, without any consideration on their part, is supported neither by reason nor evidence. An examination of Cumming's evidence will show that he did not claim any contract. He told May that he could not give him a deed on account of the judgments.

The findings of the learned trial court are amply supported by the evidence, and are, in our opinion, correct. We therefore adopt them as the findings of this court.

Appellant's second proposition is that May should have credited upon his mortgage debt, the value of the use of the land during the time he was in possession. We find that no evidence was offered as to the value of such use and occupation, unless it is found in the testimony of Mr. May, and he states that the farm never paid expenses while he was in possession, after Cummings had abandoned it. The burden of showing this payment was upon the defendant, and the trial court could not allow a credit for this item, owing to lack of definite evidence. The judgment is affirmed.

All concur, except MORGAN, Ch. J., not participating.